ACME GLASS COMPANY, Respondent, *v.* WOODS-LLOYD COMPANY, Appellant.

Fourth Department, March 27, 1918.

**Sale — breach of implied warranty as to goods sold for special purpose — latent defects not discoverable by purchaser — damages — expense of reconstructing furnace — loss of profits caused by interruption of business — Sales of Goods Act not retroactive.**

Where an action for the breach of an implied warranty in a contract of sale accrued before September 1, 1911, the Sales of Goods Act, which went into effect on that day, has no application and the controversy must be decided under the common law.

In an action for the breach of an implied warranty as to the quality of goods sold it appeared that the defendant, which manufactured flux blocks and materials used in constructing glass furnaces, had previously furnished such materials to the plaintiff and was familiar with the conditions and requirements of the plaintiff's plant and that a furnace reconstructed with material furnished by the defendant burnt out by reason of latent defects which were not discoverable by an inspection by the plaintiff, with a result that the furnace had to be torn down and rebuilt which caused loss to the plaintiff by an interruption of its business. Evidence examined, and *held*, that defendant was liable for a breach of an implied warranty that the flux blocks were free from latent defects and that a verdict for the plaintiff was not excessive.

As the complaint contained a general allegation of warranty so that proof of implied warranty was admissible without amendment the defendant cannot assert that it was deprived of a right to produce proof on that issue.

Where a buyer has no opportunity to inspect an article, or where inspection is impracticable or useless, so that he does not buy on his own judgment but relies upon that of the seller, the law implies a warranty that the goods sold are reasonably fit for the use for which they were designed by the manufacturer and seller thereof, the latter being informed of the purpose and use to which the goods are to be devoted.

On the breach of such warranty the damages which the plaintiff may recover are of two kinds, *first*, those arising from the expense of building a new furnace, and *second*, those arising from loss of profits due to the interruption of the plaintiff's business.

Evidence of the cost of the new furnace was properly received as *prima facie* proof of the reasonable cost thereof, although the amount which should be deducted for the actual use of the defective furnace may be difficult to determine.

Although the court charged that the materials furnished by the defendant must be " fit " instead of " reasonably fit," it is not ground for reversal

where it is apparent that the jury were not misled and the defendant did not raise the question of error at trial.

Ordinarily a party who desires an article which he is about to purchase to be warranted to be usable for a given period should exact an express warranty to that effect, but there may be an implied warranty that an article will be usable for a minimum period of time.

APPEAL by the defendant, Woods-Lloyd Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cattaraugus on the 6th day of September, 1917, upon the verdict of a jury, and also from an order entered in said clerk's office on the 18th day of September, 1917, denying defendant's motion for a new trial made upon the minutes.

*M. B. Jewell,* for the appellant.

*George A. Larkin,* for the respondent.

DE ANGELIS, J.:

This is an action for breach of an implied warranty in a contract of sale.

The plaintiff is a domestic corporation whose principal place of business is in the city of Olean where it conducts one of its glass factories and employs about 100 men.

The defendant is a foreign corporation of the city of Pittsburgh, in the State of Pennsylvania, and is engaged in manufacturing and selling flux blocks and other blocks and material used in the construction and maintenance of furnaces for melting the constituents of glass, referred to herein as glass furnaces.

The facts (some of which are conceded and many of which are established by uncontradicted evidence) which the jury were justified in finding are as follow:

The defendant and its predecessors up to and including the year 1911 had for many years furnished the plaintiff with flux blocks and other material for use by the plaintiff in the construction, reconstruction and maintenance of its glass furnaces. These blocks are made of clay and resemble great bricks. Among the usual sizes of such blocks are those twelve by twenty-four by eighteen inches and twelve by twenty-four by thirty-six inches. The plaintiff was engaged in manufactur-

Fourth Department, March, 1918. [Vol. 182.

ing glass bottles at its factory in the city of Olean where it maintained and operated a tank glass furnace continuously, day and night, for ten months in each year, to wit, for each month except July and August. The tank is about twenty-nine feet long and fourteen or eighteen feet wide and its sides are about three feet high. The bottom, the sides and ends are made of these clay blocks. The sides are made of flux blocks twelve by eighteen by twenty-four inches. Each side has two tiers of these blocks, laid one on the top of the other and that part of each block whose dimension is eighteen inches is vertical, making each side thirty-six inches high and twelve inches thick. On the top of the upper tier are tiles twenty-four inches long and twelve inches square, laid lengthwise, horizontally, with intervals for port holes for the introduction of gas from which heat is supplied for the melting process hereinafter described. The roof of the furnace is an arch made of silica bricks. A steel framework is used to support and strengthen the structure. In this tank, sand, lime and soda are melted to form the liquid glass from which the bottles are blown. These constituents of glass are subjected to a heat of about 2,200 degrees Fahrenheit, and are introduced into the tank in prepared batches containing proper proportions. The heat of the greatest intensity comes in contact with the blocks forming the sides of the tank. These blocks need to be made of the best German clay and in the most careful manner because of their subjection to such intense heat and they are known in the trade and business as flux blocks for that reason. The life of such blocks is from one to two years and at least one season.

After the construction or reconstruction of one of these furnaces, the first material introduced into the tank and subjected to the heat is cold glass to be melted for the purpose of glazing the flux blocks to prepare them to resist more effectively than otherwise they could the intensity of the heat to which they are to be subjected in the process of melting the sand, lime and soda.

In this same building where the furnace just described is located, there is a much smaller furnace used by the plaintiff as auxiliary to the work of the large furnace in the busier part of the season.

In March, 1911, plaintiff's president notified the defendant that this large furnace would need reconstruction in the rest period which would begin on the first of July, and about that time one of the defendant's officers inspected the furnace and conferred with the plaintiff's president regarding the number of flux blocks and other material that would be needed in the reconstruction. Later the defendant furnished the plaintiff with a blue print indicating the proposed work of reconstruction and the necessary number and location of flux blocks to be used therein. Such flux blocks with the other material were shipped by the defendant to the plaintiff in the latter part of June and thereafter paid for. The amount paid for the flux blocks was about $629. In the summer of 1911 the work of reconstruction was completed and the flux blocks received from the defendant formed the sides of the tank. In the latter days of August the interior of the tank was glazed by the melting of cold glass which operation occupied about two weeks, at the conclusion of which the process of melting sand, lime and soda began and then continued day and night until the 30th day of March following (1912) when it became necessary to turn off the heat and stop the use of the tank. Thereupon the contents of the tank were permitted to get cool and the glass was chopped out and it was discovered that many of the flux blocks had crumbled off so as to leave but an inch in thickness; that they had a spongy and honeycombed appearance, and that they contained numerous crevices permitting the fluid glass to penetrate and cause them to disintegrate. These defects were not discovered by the plaintiff before the thirtieth day of March, and were not discoverable by the plaintiff through the means of any system of inspection before the blocks were used in the reconstruction and operation of the furnace. The discovery of this condition led to the stopping of the operation of the furnace. The furnace had to be entirely torn down and a new furnace constructed in its place. The furnace that was torn down had been properly constructed and from the completion of the reconstruction up to March 30, 1912, operated properly and in the usual and customary manner and the necessity for tearing it down and the construction of a new furnace was due solely to the defective condition just

described. The new furnace cost about $3,100 and was not ready for use until about the 18th day of May, 1912. There was an interruption of the plaintiff's business for the interval between the thirtieth day of March and the eighteenth day of May, except that the smaller furnace was operated from about the ninth day of April. The plaintiff lost in profits by reason of the interruption of its business an amount which the jury might have found to be in the neighborhood of $3,000.

When the defendant furnished to the plaintiff the flux blocks in question it knew the exact situation of the plaintiff's plant in Olean, its facilities and limitations; that if this large furnace should go out of commission the plaintiff's business would be substantially at a standstill, and that if the flux blocks in question should prove to be defective, as they did prove to be, plaintiff's loss by the interruption of its business and the expense of a new furnace would be great, and, probably, no less than the jury found it to have been.

The jury rendered a verdict for $4,000 which does not seem to be excessive.

Our Sales of Goods Act (Laws of 1911, chap. 571, in effect Sept. 1, 1911, adding to Pers. Prop. Law [Consol. Laws, chap. 41; Laws of 1909, chap. 45], §§ 82–158) has no application here because the cause of action accrued before September 1, 1911. So that this controversy must be decided under the common law.

There was a general allegation of the warranty in the complaint and under this allegation proof of the implied warranty was admissible so that the complaint need not have been amended and the defendant was bound to assume that it would need the proof on the trial of which it complains it was deprived. (*Rogers* v. *Beckrich*, 46 App. Div. 429.)

We have here the case of an executory contract for the sale of articles manufactured by the seller and sold for a particular purpose which articles proved in use to be defective. The defects were not discoverable by ordinary inspection and tests. The rule seems to be well settled that where the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process

and against which reasonable diligence might have guarded. When, therefore, the buyer has no opportunity to inspect the article, or when from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture.   If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use.   (*Kellogg Bridge Co.* v. *Hamilton,* 110 U. S. 108; *Bierman* v. *City Mills Co.* 151 N. Y. 482, 490.)

The defects in the flux blocks were latent and the damages flowing from the breach of the implied warranty that there were no such defects were to be determined by the jury. Such damages reasonably to have been contemplated by the parties are of two kinds, (1) those arising from the expense of the building of the new furnace and (2) those arising from loss of profits due to the interruption of the plaintiff's business.

We think the plaintiff was entitled to recover the reasonable cost of the construction of another furnace in just the condition of the furnace that had to be torn down would have been on the 30th day of March, 1912, if the flux blocks had been without the defects disclosed.   It would not be practicable to construct a furnace in such condition but a close approximation to the same result would be attained by taking from the reasonable cost of the new furnace the value of the use of the furnace torn down up to March 30, 1912.   The evidence of the cost of the new furnace would be properly received as *prima facie* proof of the reasonable cost thereof.   (*Mayor, etc.,* v. *Second Avenue R. R. Co.,* 102 N. Y. 572.)   What amount should be deducted for such use might be difficult to determine, but would not be so uncertain as to prohibit its consideration by the jury.   We think the course adopted by the trial court in this respect was right.

It is well settled that the loss of profits in such a case as this is an element entering into the damages sustained by

the plaintiff. (*Wakeman* v. *Wheeler & Wilson Mfg. Co.,* 101 N. Y. 205; *Beeman* v. *Banta,* 118 id. 538, 542.)

*Chapman* v. *Fargo* (223 N. Y. 32) and *Cramer* v. *Grand Rapids Show Case Co.* (Id. 63) are easily distinguished from the case at bar.

The close question presented in the record arises from the instructions to the jury involving the application to the facts of the rule that there was an implied warranty that the flux blocks in question were reasonably fit for the purpose for which they were manufactured and sold. The counsel for the defendant now criticises the trial court for using the unqualified word " fit " instead of " reasonably fit." It is apparent that the jury were not misled by what was said by the court in this respect and the failure of the defendant to raise the question on the trial is a waiver of the error, if such omission could be regarded as such in the circumstances.

The jury were justified in finding upon the evidence, as we have already pointed out, that flux blocks must be usable in a glass furnace like that in question for at least the period of ten months, the glass-making season, and that these flux blocks were sold with the distinct understanding by both the plaintiff and the defendant that they were to be usable for the glass-making season. Hence the jury were justified in finding that the minimum degree of reasonable fitness required that these flux blocks should have lasted until the end of the glass-making season of 1911–1912. Ordinarily, if a party desires that an article which he is about to purchase shall be warranted by the seller to be usable for a given period, he should exact an express warranty to that effect. There is no reason *a priori* why in a given case there may not be an implied warranty that an article will be usable for a minimum period of time. We think the peculiar circumstances of this case furnish the basis for such a warranty.

The counsel for the defendant requested the court to charge as follows: " I ask your Honor to charge the jury that if the defendant made the flux blocks of first class material and first class workmanship then the plaintiff cannot recover in this action, no matter if the furnace had given out before the end of the season of 1912."

In response to this request the court said: " I will decline

to charge that, and say that if, notwithstanding they were made out of first class material and first class workmanship, the blocks were in fact defective and unfit for the use for which they were intended then the defendant would be liable, but that the jury may take into consideration the fact, if they find it to be so, that they were made of good material and workmanship on the question of whether they were fit blocks or not."

An exception was taken to this ruling.

In other similar requests which were refused and such refusals excepted to, the expression was blocks " of the best material and of the best workmanship." It will be observed that it was the aim of the court to enforce the rule that there was an implied warranty that these blocks should be reasonably fit for the purpose for which they were manufactured and sold and to keep the minds of the jury upon the evidence that they were in fact defective and unfit for that purpose. We note in this connection that no witness was called who participated in the making of the flux blocks in question. The appellant complains that it omitted to have present in court such witnesses because of its mistaken notion that the only permissible proof of the warranty alleged in the complaint was such as must show an express warranty.

At all events, it is well established that the defendant is liable for a breach of its implied warranty that the flux blocks were free from latent defects, the verdict of the jury is just and we think that the judgment and order appealed from should be affirmed, with costs.

All concurred.

Judgment and order affirmed, with costs.